***********
The Full Commission has reviewed the Deputy Commissioner's Opinion and Award based on the record of the proceedings before the Deputy Commissioner. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, and having reviewed the competent evidence of record, the Full Commission hereby affirms the Opinion and Award with minor modifications.
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing as
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission, are subject to governance by the North Carolina Workers' Compensation Act, and the Industrial Commission has jurisdiction over the parties and the subject matter.
2. The employee-employer relationship existed between the employee-plaintiff, the defendant-employer, PPG Industries, was self-insured and Key Risk Management was the administrator on the risk on the date of injury and at all times relevant herein.
3. This is an accepted claim, and the employee-plaintiff has received compensation based upon a Form 60, Employer's Admission of Employee's Right to Compensation. The employer admitted the employee's right to compensation for an occupational disease as of May 1, 1999. The employee has paid compensation based upon average weekly wages of $828.75, which results in a weekly compensation rate of $552.53. The employer has paid temporary partial disability benefits from July 24, 2000 to November 8, 2000, and from November 14, 2000 to November 18, 2000. The employer has paid temporary total disability benefits from November 19, 1999 to November 29, 1999, from June 8, 2000 to July 24, 2000, from November 8, 2000 to November 14, 2000, and from November 18, 2000 to the present. The employer has not paid any compensation for the periods of May 5, 1999 to November 19, 1999, and of November 29, 1999 to June 8, 2000, and the employee contends that he is due compensation for partial disability during these periods.
In addition, the parties submitted a packet of stipulated documents, including medical records and Industrial Commission forms, on August 24, 2001.
The Pre-Trial Agreement dated June 26, 2001 which was submitted at the hearing is incorporated by reference.
 ***********
Based upon all of the competent evidence in the record, the Full Commission makes the following
 FINDINGS OF FACT
1. Plaintiff, who is twenty-six years old and who has a tenth grade education, began working for defendant on April 16, 1994, although he had previously worked at the plant through a temporary agency. In May 1995 he became a forming operator, a position which involved winding glass. As of May 1, 1999 he developed pain in his hands which progressively worsened. Defendant admitted liability for benefits under the Workers' Compensation Act for his hand problems and provided medical care.
2. Plaintiff was initially treated by Dr. Lewis, the company doctor, who referred him to Dr. McKenzie, Dr. Riggan and then to Dr. Kuzma. Dr. Kuzma, a hand surgeon, became his treating physician. His condition was initially diagnosed as de Quervain's tenosynovitis and possible carpal tunnel syndrome. The doctors recommended conservative treatment, including medication, ice and work restrictions. Plaintiff was also given some injections to his hands. Although his symptoms improved with treatment and with the work restrictions, he continued to have pain. In October 1999 Dr. Kuzma ordered a bone scan which revealed abnormal activity in his right wrist. Consequently, on November 19, 1999 the doctor performed surgery to inspect the joint and decompress what appeared to be ulnar carpal abutment. As a result of the operation, plaintiff was out of work for ten days and defendant paid compensation to him for temporary total disability during that period.
3. Dr. Kuzma released plaintiff to return to work at one-handed work on November 29, 1999 and plaintiff did return to work. He initially did well but, as his activities increased during the next several months, his symptoms also increased. Dr. Kuzma concluded that the symptoms were stemming from the lunar triquetral joint within the wrist and he ultimately recommended surgery to fuse that joint. On June 8, 2000 he performed the operation. Plaintiff was subsequently allowed to do one-handed work. He gradually increased his activity level but again experienced increased symptoms. Dr. Kuzma ordered a CT scan in December 2000 which did not yield definitive results, although there were signs of questionable healing as well as some indications that the screw which had been inserted in the fusion operation was protruding too far out and was causing tendonitis. Consequently, Dr. Kuzma injected the lunar triquetral space under a fluoroscope for diagnostic purposes. Since the injection did not provide plaintiff with significant relief, the doctor concluded that his symptoms were probably coming from the screw. The symptoms persisted so in May 2001 Dr. Kuzma recommended a third operation to remove the screw and redo the bone graft of the lunar triquetral joint should there be a non-union. Apparently plaintiff had that operation on June 12, 2001, a couple of weeks before the hearing.
4. Although defendants have admitted liability for this claim, the parties have raised issues regarding the appropriate average weekly wage and compensation rate which should be used as well as defendant's liability for temporary partial disability before June 8, 2000. Defendant has paid compensation to plaintiff based upon an average weekly wage of $828.75. The employer's records reveal that plaintiff had earned $43,095.00 during the year preceding the agreed upon date of injury. That figure was divided by 52 weeks to arrive at the average weekly wage. Defendant has not disputed plaintiff's earnings for that period. The parties agreed that the amount is correct. Defendant contends that plaintiff was able to earn so much overtime the year of his injury and claims that the pre-injury wages do not reflect what he would normally earn such that it would be unfair to compute his average weekly based upon his actual earnings.
5. It would generally be unfair to plaintiff to base his pre-injury average weekly wage on any amount other than his actual earnings. Defendant has not shown convincing evidence of why plaintiff's pre-injury average weekly wage should not be based on his actual earnings in the relevant period. Defendant suggests that because of an economic downturn there has been less overtime available at the plant than was available before plaintiff's injury. The testimony of Mr. Burns, however, was that production was reduced by 45% in 2001 and therefore there was less available overtime with the reduction in production. The relevant period of inquiry in this claim, however, is a period ending in June, 2000; thus, Mr. Burn's testimony does not support the suggested proposition that less overtime was available in 1999 and 2000. The greater weight of the competent evidence is that overtime was not significantly reduced until 2001.
6. Plaintiff's pre-injury average weekly wage was $828.75.
7. Following the development of his occupational disease, plaintiff was placed on light duty work and was assigned to work in the buff shop. Although the company continued to pay him at his regular hourly wage for his light-duty work, he could not earn his former wage due to lack of available overtime work in his new position. When his restrictions were reduced and he would be sent to try to work as a sliver operator, his symptoms would increase, which would also prevent him from working overtime. Consequently, he suffered a partial loss of earning capacity from May 2, 1999 through the end of the year, except for the ten-day period when he was totally disabled. He then remained partially disabled until June 8, 2000 when he stopped working altogether due to his second operation.
8. According to the exhibits received into evidence, plaintiff earned a total of $35,122.80 during the year 1999 and his earnings up to the date of injury were $11,959.90. Consequently, he was able to earn $23,162.90 after May 1, 1999. The total earnings for the year reflected work through December 26, 1999, since he was paid for the following week in January 2000, so wages earned during the last five days of the year were excluded. In addition, he was temporarily totally disabled for ten days during the period in question. When those two periods are deducted, plaintiff worked a total of 32 and 5/7 weeks after May 1, 1999 for which he earned $23,162.90. At his former average weekly wage, he would have earned $27,111.96 for that period. The difference between what he earned and what he would have earned but for his injury or occupational disease was $3,949.06.
9. The period from December 27, 1999 through June 7, 2000 comprised 23 and 2/7 weeks. During that time, plaintiff was able to earn a total of $17,556.10. If he had been able to earn his former average weekly wage of $828.75, he would have earned $19,298.04, which would be $1,741.94 more than his actual earnings. When the lost earnings for both periods are combined, plaintiff earned $5,691.00 less for the periods in question due to his injury or occupational disease.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following
 CONCLUSIONS OF LAW
1. Plaintiff's average weekly wage should be computed based upon the preferred method set forth in the statute since any other method would not yield a result which is fair to him. Consequently, as of May 1, 1999, his average weekly wage was $828.75. G.S. § 97-2 (5); McAninch v.Buncombe County Schools, 347 N.C. 126 (1997).
2. A loss of earning capacity for purposes of § 97-30 is generally computed by determining the difference between the pre-injury average weekly wage and the amount which the employee is able to earn after the injury. See Thomason v. Fiber Ind., 78 N.C. App. 159, 336 S.E.2d 632
(1985), cert. den., 316 N.C. 202, 341 S.E.2d 573 (1986). When, however, plaintiff's pre-injury wages are inflated with overtime benefits earned and overtime is no longer readily available because of a down turn in the economy a comparison between the pre-injury average weekly wage and post-injury earnings may not be fair because the loss of earnings is not due to the injury. See Derosier v. WNA, ___ N.C. App. ___, 562 S.E.2d 41
(2002). In this circumstance, the pre-injury and/or post-injury calculations need to be based on information that better reflects a loss of income caused by the injury. Id. For example, in Derosier v. WNA, the Court of Appeals held that the comparison should be "between the amount of overtime available, not worked, to the" job plaintiff was performing when injured and the overtime available in the present job. Id. This calculation should reduce benefits caused by an economic slow down and for overtime which plaintiff voluntarily refuses; the intent is to render a compensation payment based on loss of earning capacity, rather than reductions caused by other circumstances. Unlike the facts in Derosier, defendant in this case has not established a lack of overtime in the relevant period prior to June 8, 2000. Thus, there is no reason to compute compensation other than the general formula of § 97-30. Plaintiff is entitled to compensation for temporary partial disability in the total amount of $3,794.00 for the periods from May 2 through November 18, 1999 and from November 29, 1999 through June 7, 2000. G.S. §97-30.
3. Plaintiff is entitled to have defendant provide all medical compensation arising from this injury by accident. G.S. § 97-2(19); G.S. § 97-25.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following
 AWARD
1. Defendant shall pay compensation to plaintiff in a lump sum of $3,794.00 for the temporary partial disability he sustained from May 2 through November 18, 1999 and from November 29, 1999 through June 7, 2000, subject to the attorney's fee hereinafter approved.
2. Defendant shall pay all medical expenses incurred by plaintiff as a result of this injury by accident.
3. Any attorney's fee in the amount of twenty-five percent of the compensation awarded is approve for plaintiff's counsel. Defendant shall pay him a lump sum of $948.50 and shall also pay him every fourth check of continuing compensation.
4. Defendant shall pay the costs.
 S/______________ RENE C. RIGGSBEE COMMISSIONER
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_____________ THOMAS J. BOLCH COMMISSIONER